UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SCOTT SCHUMACHER,

        Plaintiff,

    v.

VISITING NURSING ASSOCIATION OF
WESTERN NEW YORK, INC., and
COMMUNICATION WORKERS OF
AMERICA,

        Defendants.

_____

22-CV-1011-LJV
DECISION & ORDER

On December 27, 2022, the plaintiff, Scott Schumacher, commenced this action under the Labor Management Relations Act of 1947 ("LMRA") Section 301, codified at 29 U.S.C. § 185 ("section 301"). Docket Item 1. He asserts claims against his former employer, Visiting Nursing Association of Western New York, Inc. ("VNA"), and his union, Communication Workers of America ("CWA"), related to the termination of his employment with VNA. *Id.*

On June 2, 2023, VNA and CWA moved to dismiss the complaint, Docket Item 12 (VNA's motion to dismiss); Docket Item 13 (CWA's motion to dismiss);[1] on June 30, 2023, Schumacher responded, Docket Item 16; and on July 14, 2023, VNA replied, Docket Item 17.

_____

[1] CWA's motion was styled as a motion for judgment on the pleadings but sought "[a]n [o]rder pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing all claims of the [p]laintiff Scott Schumacher in the[ir] entirety." Docket Item 13.

Because CWA submitted, and VNA cited, evidence outside the pleadings in support of their respective motions to dismiss, the parties were given notice that under Federal Rule of Civil Procedure 12(d), the Court was converting VNA's and CWA's motions to dismiss into motions for summary judgment. *See* Docket Item 18. All parties then were given the opportunity to file "additional materials that they would like the Court to consider." *Id.* at 2; *see also* Fed. R. Civ. P. 12 (d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). VNA and CWA both submitted additional materials, Docket Items 21 (VNA's additional materials) and 24 (CWA's additional materials); Schumacher responded and submitted additional materials of his own, Docket Item 25; and VNA and CWA both replied, Docket Items 26 (CWA's reply) and 27 (VNA's reply).

For the following reasons, VNA's converted motion for summary judgment, Docket Item 12, is DENIED, and CWA's converted motion for summary judgment, Docket Item 13, is DENIED IN PART and GRANTED IN PART.

## **BACKGROUND**[2]

VNA "provides home health care services for patients across ten Western New York counties[,] . . . includ[ing] nursing, occupational therapy, [and] physical therapy."

---

[2] On a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011). Unless otherwise noted, the following facts are taken from the parties' statements of material facts, Docket Item 21 (VNA's statement); Docket Item 24 (CWA's statement); Docket Item 25-1 (Schumacher's statement and response to VNA's statement); Docket Item 25-2 (Schumacher's statement and response to CWA's

Docket Item 21 at ¶ 1; *see* Docket Item 25-1 at 1, ¶ 1.[3]  "Schumacher worked for VNA

as an occupational therapist from April 19, 2004[,] until October 25, 2021," when VNA

terminated his employment.  Docket Item 21 at ¶ 2; *see* Docket Item 25-1 at 1, ¶ 2.

While in that position, Schumacher was a member of CWA Local 1122, "which is party

to a collective bargaining agreement ['CBA'] covering certain VNA employees."  Docket

Item 21 at ¶ 2; *see* Docket Item 25-1 at 1, ¶ 2.

  Under the terms of the CBA, VNA may discharge employees for "just cause."

Docket Item 24 at ¶ 13; *see* Docket Item 25-2 at 2, ¶ 13.  "A claim that VNA did not have

just cause to discharge an employee is subject to [a] grievance process."  Docket Item

24 at ¶ 13; *see* Docket Item 25-2 at 2, ¶ 13.  That grievance process has "three

steps  . . . before submission to arbitration."  Docket Item 24 at ¶ 15; *see* Docket Item

25-2 at 3, ¶ 15.  Only CWA, "not individual members and/or employees, may submit a

grievance to arbitration at the conclusion of" the third step of the grievance process.

*See* Docket Item 24 at ¶ 15 (emphasis omitted); *see* Docket Item 25-2 at 3, ¶ 15.

  VNA's home health care workers "are required to document their work with

patients by completing an electronic Visit Note Report ('VNR') in VNA's web-based

---

statement); Docket Item 27 (VNA's reply statement); and the exhibits incorporated in
those filings, including Schumacher's termination notice, Docket Item 13-2, and the CBA
between CWA and VNA, Docket Item 13-11.  Any disputed facts are resolved in favor of
Schumacher, the non-moving party.

  Schumacher's two statements of material facts each contain two sections:
response statements to VNA's and CWA's respective statements, Docket Item 25-1 at
1-5 and Docket Item 25-2 at 1-4, and statements "of additional facts," Docket Item 25-1
at 5-7 and Docket Item 25-2 at 4-6.  Because the paragraph numbers for each section
begin with paragraph one, citations to Docket Items 25-1 and 25-2 include both a page
and paragraph number.

  [3] Page numbers in docket citations refer to ECF pagination.

electronic medical record ('EMR') system."  Docket Item 21 at ¶ 3; *see* Docket Item 25-1 at 1, ¶ 3.  "Information should be recorded contemporaneous with each patient visit and should describe the services provided and document the start and end time for the visit, as well as the patient's vital signs during the visit."  Docket Item 21 at ¶ 3; *see* Docket Item 25-1 at 1, ¶ 3.  The "EMR system includes GPS tracking technology" that "records the locations when an employee starts and ends a patient interaction in a[ ] VNR" and "timestamps entries into the VNR, including when patients' vitals are entered."  Docket Item 21 at ¶ 6; *see* Docket Item 25-1 at 2, ¶ 6.[4]  "Among other reasons, VNA consults the GPS location technology when patients complain that a provider has failed to show for an appointment."  Docket Item 21 at ¶ 8; *see* Docket Item 25-1 at 2, ¶ 8.

VNA "is part of the Kaleida Health system."  Docket Item 21 at ¶ 1; *see* Docket Item 25-1 at 1, ¶ 1.  Kaleida Health Policy HR 15 prohibits the "[f]alsification or alteration of Kaleida Health records, including time cards[] or time collection systems, [and] payroll, benefits, medical, personnel, patient, computer[,] or other official system records."  Docket Item 13-2 at 2 (Schumacher termination notice quoting Policy HR 15).  "VNA's Standards of Conduct Policy provides that falsifying patient records 'may warrant serious discipline up to and including termination without prior notice.'"  Docket Item 21 at ¶ 5; *see* Docket Item 25-1 at 1, ¶ 5.[5]

---

[4] Schumacher admits that the EMR system includes GPS tracking technology but disputes that this GPS data is accurate.  Docket Item 25-1 at 2, ¶ 6.

[5] Schumacher "[d]enies and disputes" that the Conduct Policy quoted by VNA "is germane to" his situation "because [he] did not falsify any records," but he does not appear to dispute the fact that the Conduct Policy contains the quoted language.  *See* Docket Item 25-1 at 1, ¶ 5.

In October 2021, a patient complained that a therapist missed a scheduled appointment.  Docket Item 21 at ¶ 9; *see* Docket Item 25-1 at 2, ¶ 9.[6]  This resulted in an investigation into Schumacher's data entries, about which the parties tell vastly different stories.

According to VNA, their investigator "was able to see that Schumacher was not the provider who no-showed on the date in question."  Docket Item 21 at ¶ 11.  But the investigator found "a different discrepancy in Schumacher's report for that day": GPS data indicated that Schumacher was seven miles away from the patient's house when the visit was documented as beginning.  *Id.* at ¶¶ 11-12.  "After finding this patient discrepancy," a broader review "identified dozens of additional instances where Schumacher . . . recorded a start or end time for a visit but . . . was not physically present at the patient's location."  *Id.* at ¶ 13.

For his part, Schumacher denies that there were any discrepancies in his report for the day in question (October 13, 2021) and denies that the GPS data was accurately analyzed by VNA.  Docket Item 25-1 at 2, ¶¶ 12-13.  Schumacher also disputes the accuracy of the GPS and VNR data that VNA submitted, Docket Item 21-2 (reports), noting, for example, that the service location listed for one visit "is the office of the Erie

---

[6] The defendants say that the patient complained that Schumacher missed the appointment.  Docket Item 21 at ¶ 9; Docket Item 24 at ¶ 5.  Schumacher disputes this, stating that "a patient complained about a physical therapist who failed to show, not [Schumacher], who is an [o]ccupational [t]herapist."  Docket Item 25-1 at 2, ¶ 9; Docket Item 25-2 at 1, ¶ 5.  Both defendants acknowledge that Schumacher was not the provider who failed to show for that appointment, but they say that this complaint prompted a broader investigation into Schumacher's data-entry practices.  *See* Docket Item 21 at ¶¶ 10-11; Docket Item 24 at ¶¶ 6-7.  Regardless of who missed this appointment, however, and resolving all factual issues in Schumacher's favor, it appears to the Court that some sort of patient complaint about a missed appointment prompted an investigation into Schumacher.

County Department of Social Services at the Erie County Administrative Building in Buffalo, not the site where [Schumacher] performed [occupational therapy] services for the patient," Docket Item 25-1 at 6, ¶ 7.[7]

On October 21, 2021, Schumacher met with VNA's Senior Director of Human Resources, Paul Coleman; two CWA representatives; and two other individuals who appear to be VNA employees.  Docket Item 21 at ¶ 14; *see* Docket Item 25-1 at 3, ¶ 14. VNA says that at the meeting "Schumacher admitted that he 'cut corners' and entered data when he was not actually visiting with a patient."  Docket Item 21 at ¶ 15. Schumacher tells a slightly different story, denying that he "admitted to cutting corners as meaning entering data when he was not actually visiting with a patient or recording patient vitals prior to seeing patients," Docket Item 25-1 at 3, ¶ 15, but admitting that he "opened EMR on some occasions prior to entering patients' homes, for reasons explained to VNA at the October 21, 2021 meeting," *id.* at 3, ¶ 16.

Schumacher expanded on those reasons in the declaration he submitted in opposing the motions for summary judgment, stating that he "followed customs and courses of care[] adopted by many VNA therapists and practitioners[] to prepare for home visits by making tablet entries without wasting patients' time in their homes." Docket Item 25-4 at ¶ 29.  He also says that "[o]pening or closing visits on [his] tablet in [his] vehicle, before arriving in or leaving from neighborhoods that might present danger, was consistent with good safety practices, common among VNA therapists and

---

[7] VNA says that this specific service location is "immaterial," because "that date did not show a discrepancy in location on VNA's GPS analysis."  Docket Item 27 at 4.

practitioners," and had been suggested during a VNA monthly meeting by a Kaleida security officer.  *Id.* at ¶ 32.

Schumacher's employment was terminated by VNA on October 25, 2021, Docket Item 24 at ¶ 10; *see* Docket Item 25-2 at 2, ¶ 10, and Schumacher then "filed a grievance challenging his termination," Docket Item 24 at ¶ 16; *see* Docket Item 25-2 at 3, ¶ 16.  As a result, and as part of the CBA's three-step grievance process, CWA representatives met three times with VNA representatives.  Docket Item 24 at ¶ 17; *see* Docket Item 25-2 at 3, ¶ 17.  At each meeting, CWA "challenged Schumacher's termination and requested a reduction from termination to suspension without backpay." Docket Item 24 at ¶ 18; *see* Docket Item 25-2 at  3, ¶ 18.[8]  VNA says that at those three meetings, it "explained its investigation and reviewed, with [the CWA] representatives then present, the documents that supported . . . VNA's decision to terminate Schumacher" and "reiterated Schumacher's own admissions, made during the investigation interview[,] . . . that he 'takes short cuts' on his documentation."  Docket Item 21 at ¶ 21.[9]  Schumacher notes that he was not present at any of these three meetings.  Docket Item 25-2 at 3, ¶ 17.

"By a January 2022 written response, after proceeding through all steps of the CBA grievance process, VNA finally denied the grievance and upheld the termination." Docket Item 24 at ¶ 19; *see* Docket Item 25-2 at 3, ¶ 19.  "At the conclusion of the

---

[8] In response to CWA's representation that it challenged Schumacher's termination, Schumacher specifically "[a]dmits that the employer denied CWA's efforts and denies that CWA challenged VNA."  Docket Item 25-2 at 3, ¶ 18.

[9] Schumacher responds to this statement by, in part, "disput[ing] the documents or flawed analysis of GPS data on which VNA claims it relied."  Docket Item 25-1 at 4, ¶ 21.

grievance process,[10] CWA decided not to arbitrate the grievance[.]"  Docket Item 24 at ¶ 20; *see* Docket Item 25-2 at 3, ¶ 20.[11]

On March 10, 2022, CWA Staff Representative Shawn LeBlanc informed CWA Local President 1122 President John Mudie by letter that CWA would not arbitrate Schumacher's grievance.  Docket Item 24 at ¶ 21; *see* Docket Item 25-2 at 3, ¶ 21.  In that letter, on which Schumacher was copied, LeBlanc stated that "there [wa]s no question[ that] Schumacher had falsified documentation"; LeBlanc also said that he "d[id] not believe that [CWA] would be successful in winning this grievance before an arbitrator."  *See* Docket Item 13-4 at 2-3.  LeBlanc's letter noted that this decision could be appealed to CWA District 1 Area Director Debora Hayes within 30 days.  *Id.* at 3.

---

[10] Under the CBA, VNA's Administrator of Human Resources or a designee was required to provide a written answer to the grievance within "fifteen (15) working days from the date of the meeting where the Step 3 grievance was orally presented."  *See* Docket Item 13-11 at 28.  If, after that written answer, the grievance still was not resolved, it could be submitted to arbitration within "thirty (30) working days of the answer of the Administrator of Human Resources."  *Id.* at 29.  If it was not submitted to arbitration by that deadline, the grievance would be "deemed closed by the answer of the Administrator of Human Resources or designee."  *Id.*

The record before the Court does not include details about exactly when these events occurred.  In his complaint, Schumacher alleges that "[b]ased on discussions with CWA Representative [Shawn] LeBlanc, Schumacher understands that Step 3 in the grievance process . . . was completed with VNA's written response sometime in early January 2022, possibly January 4, 2022."  Docket Item 1 at ¶ 42.  And in its Statement of Undisputed Material Facts, CWA says that the grievance process was completed by VNA's "January 2022 written response," citing the complaint.  *See* Docket Item 24 at ¶ 19.  But that response has not been provided to the Court.

[11] CWA says that this was "because it determined that it was not likely to be successful" in arbitration, "in part because Schumacher had admitted . . . the conduct alleged."  Docket Item 24 at ¶ 20.  Schumacher "[d]enies the accuracy of CWA's characterization of the reasons for not proceeding to arbitrate [his] grievance."  Docket Item 25-2 at 3, ¶ 20.

During that 30-day period, on March 28, 2022, "Schumacher viewed his grievance file at CWA's office."  Docket Item 21 at ¶ 26; *see* Docket Item 25-1 at 4, ¶ 26. In his declaration, Schumacher says he was not permitted to make copies of documents in the grievance file.  Docket Item 25-4 at ¶ 40.

Schumacher nevertheless appealed to Hayes on April 8, 2022.  Docket Item 24 at ¶ 22; *see* Docket Item 25-2 at 3, ¶ 22.  In his appeal, Schumacher argued, among other things, that the "issues" allegedly justifying his termination "were never brought to his attention" before his employment was terminated.  Docket Item 13-5 at 2 (Schumacher's appeal).  Schumacher also raised a concern that "the applicable deadline for requesting arbitration" had passed.  *Id.* at 3.

Hayes denied the appeal on April 20, 2022, stating that she "d[id] not believe that [CWA] would be successful winning [Schumacher's] grievance before an arbitrator." Docket Item 13-6 at 3.  In her decision, Hayes emphasized that "VNA discovered that [Schumacher] opened approximately 85 visits while [Schumacher was] still in the car driving to the patient's home" and that Schumacher had not denied that allegation.  *See id.* at 2.[12]  Hayes also referred to previous "grievance arbitrations" that CWA had lost under the same policy Schumacher was accused of violating.  *See id.* at 3.  Hayes did not address Schumacher's concerns about the deadline to request arbitration.  *See generally id.*

On May 18, 2022, Schumacher appealed Hayes's decision.  Docket Item 24 at ¶ 24; *see* Docket Item 1 at ¶ 10; Docket Item 25-2 at 3, ¶ 24.  About a month later,

---

[12] Schumacher "denies and disputes the accuracy of Hayes's characterization of the reasons for not proceeding to arbitrate [his] grievance."  Docket Item 25-1 at 4, ¶ 28.

Schumacher received a letter—dated June 17, 2022—from the CWA District One Vice President, Dennis G. Trainor, denying his appeal.  Docket Item 24 at ¶ 25; *see* Docket Item 25-2 at 3, ¶ 25.  Like LeBlanc and Hayes, Trainor told Schumacher he "d[id] not believe [CWA could] prevail in arbitration" of Schumacher's grievance.  Docket Item 13-7 at 2.  In response to Schumacher's assertion "that the issues cited by VNA to justify [Schumacher's] termination were never brought to [Schumacher's] attention," Trainor said that "[t]he duty of an employee to be truthful in documenting their work does not require any special training or notice."  *Id.*  In response to Schumacher's concern that the deadline to pursue arbitration had passed, Trainor stated that "[t]he grievance was protected for possible arbitration on January 12, 2022," but he did not provide any further details.  *Id.* at 3.  Trainor also told Schumacher that any appeal must be "filed with" CWA's President, Christopher Shelton, "within thirty (30) days of the date of [Trainor's] decision."  *Id.*

On July 18, 2022, Schumacher appealed to Shelton.  Docket Item 24 at ¶ 26; *see* Docket Item 13-8; Docket Item 25-2 at 3, ¶ 26.  Schumacher's appeal argued, among other things, that "VNA used inaccurate GPS coordinates" to "erroneously" conclude that Schumacher falsified patient records.  Docket Item 13-8 at 3.

A month later, Shelton denied Schumacher's appeal, giving two reasons for doing so.  *See* Docket Item 13-9.  First, Shelton determined that Schumacher's appeal was "untimely" because it "was received 31[ ]days after . . . Trainor's decision was issued."  Docket Item 13-9 at 2.  Second, "on the merits," Shelton "agree[d] with . . . Trainor's decision."  *Id.*  Shelton emphasized that although Schumacher made "a number of claims regarding irregularities in the data [VNA] cites for [his] termination," he

had "not rebut[ted] the charge that [he] logged patient vitals prior to reaching the patient's location, instead arguing that this practice was common amongst other [VNA] employees." *Id.*

Finally, Schumacher appealed to the CWA Executive Board, the final step in CWA's internal appeal process. Docket Item 24 at ¶¶ 29-30; *see* Docket Item 25-2 at 4, ¶¶ 29-30. After that appeal also was denied, Docket Item 24 at ¶ 30; *see* Docket Item 25-2 at ¶ 30; *see also* Docket Item 13-10 (10/26/22 letter denying appeal), Schumacher commenced this action against CWA and VNA, *see* Docket Item 1.

## **LEGAL PRINCIPLES**

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' i.e., 'it is quite clear what the truth is,' and no rational factfinder could find in favor the nonmovant." *Id.* (italics and internal citations omitted) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); and then quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)).

The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). A genuine factual issue exists when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

"[T]he court must view the evidence in the record in the light most favorable to the non-moving party" and draw "all reasonable inferences in that party's favor." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). But "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

<u>**DISCUSSION**</u>

Schumacher raises three claims: (i) that CWA breached its duty of fair representation, (ii) that CWA "negligently" allowed his grievance to lapse, and (iii) that VNA wrongfully terminated his employment in violation of the CBA. Docket Item 1 at ¶¶ 50-63.

## I.   SECTION 301/FAIR REPRESENTATION

### A.   The Nature of Schumacher's Claims

Schumacher brings this action under section 301 of the LMRA. *See* Docket Item 1 at ¶ 7. "There are two types of [section] 301 claims." *Allen v. United Parcel Serv., Inc.*, 988 F. Supp. 2d 293, 298 (E.D.N.Y. 2013). "A pure [section] 301 claim is one that simply alleges that the employer breached the CBA." *Id.* On the other hand, in "a hybrid [section] 301/fair representation claim," the plaintiff "alleges that the employer breached the CBA and that the union breached its duty of fair representation." *Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 33 (2d Cir. 2000); *see also DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165 (1983).

Here, the action is not styled as a hybrid section 301/fair representation claim, but Schumacher does not dispute the defendants' contention that his claims against

CWA for breach of the duty of fair representation and VNA for wrongful termination in violation of the CBA should be construed as a hybrid claim. *See, e.g.*, Docket Item 25 at 9 (discussing standards applicable to hybrid section 301/fair representation claims). The Court therefore does just that and deems Schumacher's first claim against CWA for breach of the duty of fair representation and third claim against VNA for wrongful termination in breach of the CBA to be a hybrid section 301/fair representation claim.

"To establish a hybrid [section] 301/[fair representation] claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 178 (2d Cir. 2001). "Because a union's breach of the duty of fair representation 'is a prerequisite to consideration of the merits of [the] plaintiff's claims against' an employer for breach of a CBA, courts presented with hybrid claims need not reach the question of whether the employer violated the CBA unless the union has acted arbitrarily, in bad faith, or discriminatorily." *Hill v. City of New York*, 136 F. Supp. 3d 304, 349 (E.D.N.Y. 2015) (quoting *Acosta v. Potter*, 410 F. Supp. 2d 298, 309 (S.D.N.Y. 2006)). "The converse is also true—that is, in a hybrid claim, if the employer is not liable to the employee, neither is the union." *Acosta*, 410 F. Supp. 2d at 309. Thus, Schumacher's hybrid claims against CWA and VNA rise and fall together: He must both establish that CWA has breached its duty of fair representation and that VNA breached the CBA in terminating him. If he cannot establish both, then his hybrid section 301/fair representation claim necessarily fails.

B.    **Statute of Limitations**

As an initial matter, VNA and CWA both contend that this action is untimely. Docket Item 27-1 at 1-2; Docket Item 24-2 at 8-9.  On summary judgment, when deciding whether an action is timely, "the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued."  *See Szymanski v. Local 3, Int'l Bhd. of Elec. Workers*, 577 F. App'x 52, 53 (2d Cir. 2014) (summary order) (quoting *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995)).  "Where a motion for summary judgment is based on 'the running of the applicable statute of limitations and [the] defendant shows that the prescribed period has elapsed, [the] plaintiff may be able to defeat summary judgment by introducing facts, by affidavits or other evidence, raising a genuine issue whether the statute should be suspended.'"  *Cash v. Washington Metr. Area Transit Auth.*, 2005 WL 6949855, at *2 (D.D.C. Jan. 13, 2005) (quoting 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedures § 2734 (3d ed. 1998)).

A hybrid section 301/fair representation claim is subject to a six-month statute of limitations, "which begins to run when the employee knew or should have known of the breach of the duty of fair representation."  *White v. White Rose Food, a Div. of DiGiorgio Corp.,* 128 F.3d 110, 114 (2d Cir. 1997).  "[A]ny subsequent failure by the union to represent the employee is not treated as a continuing violation relating back to the original breach."  *Connor v. Elmhurst Dairy, Inc.*, 2016 WL 126373, at *2 (E.D.N.Y. Jan. 11, 2016) (citing *Legutko v. Local 816 Int'l Bhd. of Teamsters*, 853 F.2d 1046, 1048 (2d Cir. 1988)).  This limitations period may be tolled while an employee seeks relief through the union's internal grievance process.  *See Austin v. Gen. Motors Corp.*, 1995 WL 866220, at *8 (W.D.N.Y. Dec. 1, 1995) (citing *Ghartey v. St. John's Queens Hosp.*,

14

869 F.2d 160, 163 (2d Cir. 1989)).  But "[w]here a union refuses or neglects to assist a

union member, decides to stop assisting a member, or acts against the interests of a

member, a breach of duty by the union is apparent to the member at the time she learns

of the union action or inaction about which she complains."  *Ghartey*, 869 F.2d at 165

(internal citations omitted).

Both CWA and VNA argue that Schumacher's action was filed outside the six-

month statute of limitations, which began to run on March 15, 2022, when Schumacher

received LeBlanc's letter indicating that the union would not be pursuing arbitration.

Docket Item 27-1 at 1; Docket Item 24-2 at 8.  In response, Schumacher says that the

statute of limitations was tolled while he pursued his internal union appeals.  Docket

Item 25 at 8-11.  Because the internal appeals process did not end until he received the

October 2022 letter advising that the CWA Executive Board had upheld the decision not

to arbitrate, Schumacher says, he commenced this action well within the six-month

period.  *See* Docket Item 25 at 2, 10 ("Schumacher . . . brought this action well within

six months from the final disposition of . . . administrative efforts with CWA to proceed to

arbitration of his grievance.").

As Schumacher notes, *id.* at 8-11, courts can exercise their discretion to toll the

six-month statute of limitations during the pendency of a union member's internal

appeal.  *See Cesiro v. Rite Aid of New York*, 2022 WL 392907, at *5 (S.D.N.Y. Feb. 9,

2022) (finding that "the statute of limitations was tolled while [plaintiff] pursued her

internal appeal of SEIU's decision" not to arbitrate her grievance); *Casella v. D'Inzillo*,

1987 WL 109101, at *4 (S.D.N.Y. Mar. 18, 1987) (tolling statute of limitations where

plaintiff had completed "good faith" appeals to executive board, membership, and

international union).  This Court finds that there is at least a question of fact as to whether tolling is appropriate here.

VNA argues that tolling is not appropriate because the relevant internal appeal procedure was permissive and not mandatory; in other words, VNA says, Schumacher could, but was not required to, exhaust his internal appeals before commencing this action.  Docket Item 27-1 at 1-2.  But VNA does not cite any caselaw holding that pursuing permissive internal appeals does not toll the statute of limitations in a hybrid action.  Instead, VNA says that the case cited by Schumacher stands for the proposition that the statute of limitations is tolled only "where the plaintiff was *required* to exhaust their [sic] claims prior to bringing a court action."  Docket Item 27-1 at 2 (citing *Cesiro*, 2022 WL 392907, at *5).

This Court does not read *Cesiro*, which in any event is not binding, to stand for that proposition.  In that case, the district court noted that "the amended complaint indicates that [the plaintiff] was following some [union] internal administrative process, as required to exhaust her claim for breach of the duty of fair representation prior to bringing the instant action."  *Cesiro*, 2022 WL 392907, at *5.  But the court also noted that "the complaint include[d] scant information on the procedures [the plaintiff] followed, and [the union]'s constitution and bylaws [we]re neither attached nor incorporated by reference."  *Id.*  In other words, in the case cited by VNA for the proposition that the six-month statute of limitations is tolled only when the internal appeal process is mandatory, it was unclear whether that process was mandatory.[13]

---

[13] The court's reference to an "internal administrative process . . . required to exhaust her claim for breach of the duty of fair representation," *Cesiro*, 2022 WL 392907, at *5, does not affect this analysis.  Procedures may be required to exhaust

Moreover, the critical question for the purposes of tolling is not whether the appeals were in fact necessary but whether Schumacher "*knew or should have known* that his appeals were futile or improper." *See Casella*, 1987 WL 109101, at *3-4 (emphasis added) (rejecting defendants' argument that "plaintiff's attempts to appeal do not extend the limitations period because the appeals had no basis in the documents creating the union structure" where plaintiff's appeals "appear[ed] to have been made in good faith"); *cf. Legutko*, 853 F.2d at 1054 (finding tolling inappropriate when "[r]ather than following these established procedures for filing a grievance, [plaintiff] instead chose to follow his own, informal approach"). And there is no indication in the record that Schumacher knew that his appeals—which he pursued through the established union process—were futile.

Viewing the evidence in the light most favorable to Schumacher, the Court concludes that there are at least genuine issues of material fact as to whether he knew (or should have known) that his internal appeals were futile and therefore whether tolling is appropriate. The record before the Court shows that Schumacher was diligently pursuing the CWA internal appeals process, and a reasonable jury might well find that he believed in good faith that his appeals may be successful. In fact, it is difficult to imagine why Schumacher would go through the effort of completing CWA's internal appeals process, as opposed to simply filing suit in federal court, if he did not harbor some hope that one of those appeals would be successful. Mindful "that even a diligent plaintiff pursuing his rights in this context may lack sophistication with regard to

---

administrative appeals even if exhaustion is not required. And this Court does not read *Cesiro* as reaching any conclusion as to whether exhaustion was required or simply permitted.

labor issues and grievance practices," *see Monroe v. Gotham Bldg. Maint. Corp.*, 1992 WL 80717, at \*4 (S.D.N.Y. Apr. 8, 1992), and in light of the "national labor policy favor[ing] exhaustion of intra-union appeal remedies as a means of encouraging private rather than judicial resolution of labor disputes," *see Williams v. United Auto Workers Loc. 501*, *AFL-CIO*, 841 F. Supp. 499, 502 (W.D.N.Y. 1993), it would be unfair to penalize a plaintiff for pursuing internal union appeals before making a federal case out of his grievance.

For all those reasons and based on the record currently before it, this Court denies the defendants' motions for summary judgment insofar as they are based on the statute of limitations

### C.     Duty of Fair Representation

Schumacher says that CWA breached its duty to represent him fairly.  A union's "duty of fair representation . . . derives 'from the union's statutory role as exclusive bargaining agent.'"  *Dillard v. SEIU Loc. 32 BJ*, 2015 WL 6913944, at \*4 (S.D.N.Y. Nov. 6, 2015) (quoting *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 74 (1991)).  "Because federal policy gives unions wide latitude to act in their representative capacity," a plaintiff alleging breach of the duty of fair representation bears "an enormous burden." *Id.* (citation omitted).

"In order to breach the duty of fair representation, [a] union's actions must be . . . arbitrary, discriminatory, or in bad faith, and there must be a causal connection between the union's actions and the employee's injuries."  *Moore v. Am. Fed'n of State, Cnty., and Mun. Emps. Loc. 1095*, 2022 WL 262347, at \*7 (W.D.N.Y. Jan. 28, 2022) (citing *Vaughn v. Air Line Pilots Ass'n Int'l*, 604 F.3d 703, 709 (2d Cir. 2010)); *see also*

*Seeman v. Loc. 32B-32J, Serv. Emps. Union*, 769 F. Supp. 2d 615, 621 (S.D.N.Y. 2011) (noting that "[a] plaintiff asserting a fair representation claim has the burden of proving two elements[:] . . . that the union's actions or inactions are . . . arbitrary, discriminatory, or in bad faith" and that there is "a causal connection between the union's wrongful conduct and his injuries" (citation and internal quotation marks omitted)).

"A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Vaughn*, 604 F.3d at 709 (citation and internal quotation marks omitted). "[A]rbitrary conduct amounting to a breach . . . may include acts o[r] omission[s] which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee[,] and so unrelated to legitimate union interests as to be arbitrary." *N.L.R.B. v. Loc. 282, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 740 F.2d 141, 147-48 (2d Cir. 1984) (citation and internal quotation marks omitted) (failure to inform union members of arbitration award's terms was an arbitrary "act o[r] omission"); *see also Bolah v. Loc. 804 Union,* 2019 WL 3577709, at *5 (E.D.N.Y. Aug. 5, 2019). "A union may breach its duty when its delays in processing a meritorious grievance result in prejudice to the plaintiff, such as foreclosing arbitration." *Greene v. St. Barnabas Hosp.*, 727 F. App'x 21, 23 (2d Cir. 2018) (summary order).

"A union's acts are discriminatory when substantial evidence indicates that it engaged in discrimination that was intentional, severe, and unrelated to legitimate union objectives." *Vaughn*, 604 F.3d at 709 (citation and internal quotation marks omitted).

"Bad faith, which encompasses fraud, dishonesty, and other intentionally misleading conduct, requires proof that the union acted with an improper intent, purpose, or motive." *Id*. at 709-10 (citation and internal quotation marks omitted). If a union's actions are not arbitrary, discriminatory, or taken in bad faith, the union has not breached its duty of fair representation; "even negligence on the union's part does not give rise to a breach." *Id*. at 709 (citation omitted).

"To survive a motion for summary judgment, a plaintiff alleging a breach of the duty of fair representation must 'set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty[,] or arbitrary exercise of discretion.'" *Gold v. Local Union No. 888 U.F.C.W., AFL-CIO*, 758 F. Supp. 205, 208 (S.D.N.Y. 1991) (quoting *Spielmann v. Anchor Motor Freight*, 551 F. Supp. 817, 822 (S.D.N.Y. 1982)). So on summary judgment, "the question facing [a] court is whether [the plaintiff] has alleged sufficiently concrete facts from which [a] court could reasonably infer that the union handled [the] plaintiff's grievance in an arbitrary fashion and whether or not the union based its action on some rational consideration." *See id*. (internal quotation marks omitted).

Schumacher cites a litany of actions (and inactions) on the part of CWA that, he says, demonstrate its breach of the duty of fair representation.[14] He first focuses on his

---

[14] As noted earlier, a union's actions can breach the duty of fair representation when they are arbitrary, discriminatory, or taken in bad faith. Schumacher alleges that CWA engaged in conduct that was discriminatory (based on his age). *See* Docket Item 1 at ¶ 55. But he does not otherwise say why he believes that CWA discriminated against him based on his age, and it is unclear to the Court how the events as pleaded could do so. The Court's analysis of CWA's alleged breach of the duty of fair representation therefore focuses on arbitrariness and bad faith in connection with the union's denial of Schumacher's appeals to hide its failure to preserve the right to arbitrate.

involvement (or lack thereof) in the grievance process that resulted in his grievance not going to arbitration. In particular, he notes that CWA did not consult with him in connection with their submissions, that he did not attend any of the three CBA-mandated "step" meetings, and that CWA did not permit him to make copies of the documents in his grievance file. *See* Docket Item 25 at 16-17. If he had been included in the process, Schumacher says, he would have been able to identify the data errors that CWA "unduly credited," *id.* at 5, and thus set the stage for a successful arbitration.

"A union has broad discretion in its decision whether and how to pursue an employee's grievance against an employer." *Castro v. 32BJ Union*, 800 F. Supp. 2d 586, 593 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). Although "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, union members do not have an absolute right to have their grievances taken to arbitration." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 128 (2d Cir. 1998) (alteration, citation, and internal quotation marks omitted). Moreover, "as a matter of law, a union representative's failure to keep a grievant informed of the status of his or her grievance is not a breach of the duty of fair representation." *Cover v. Am. Postal Workers Union, AFL-CIO*, 2006 WL 8441397, at *7 (S.D.N.Y. July 21, 2006); *see also Caputo v. Nat'l Ass'n of Letter Carriers*, 730 F. Supp. 1221, 1230 (E.D.N.Y. 1990) ("A union does not act unfairly when it fails to consult with or advise a grievant of its bargaining activities . . . ."). And taking each of those complaints in isolation, every one of those actions could be considered a tactical decision that, even if negligent, does not meet the substantial burden of establishing arbitrary conduct that breaches the duty of fair representation. *See Castro*, 800 F. Supp. 2d at 594-95 ("Tactical decisions

21

regarding the resolution of a grievance are within the [u]nion's discretion" even if decisions are negligent or wrong in hindsight) (collecting cases).

That, however, is not the end of Schumacher's issues with CWA. Schumacher also alleges that CWA was negligent when it failed to bring his claim to arbitration within the timeframe required by the CBA and then covered up that failure by denying his appeals. Schumacher argues that because CWA missed the deadline to proceed to arbitration under the CBA, his otherwise meritorious grievance was not arbitrated. And he says that the subsequent denials of his internal CWA appeals were nothing more than attempts to cover up CWA's procedural error. Viewed in this light, the issue is not simply that CWA failed to pursue arbitration, but rather that it acted arbitrarily and in bad faith when it denied his subsequent appeals only because of its procedural error that made arbitration impossible.

Under the terms of the CBA, arbitration needed to commence within 30 days of VNA's decision on Schumacher's grievance. *See* Docket Item 13-11 at 29 (providing that if a "grievance is still unresolved" following the third grievance step, "the matter shall be submitted to arbitration within thirty (30) working days of the [VNA] answer" and that if it is not, "the grievance is deemed closed"). And, as was discussed earlier, only CWA, not an individual member such as Schumacher, could "submit a grievance to arbitration at the conclusion of" the third step of the grievance process. *See* Docket Item 24 at ¶ 15; Docket Item 25-2 at 3, ¶ 15. Schumacher believes that the fact that CWA did not inform him of its decision not to arbitrate his grievance until after the 30-day period had ended, coupled with the union's silence about how it had "protected" his grievance for possible arbitration, means that its decision not to arbitrate may well have

been based on a procedural error—namely, the failure to pursue arbitration by the CBA's deadline. *See, e.g.*, Docket Item 1 at ¶¶ 19-20, 43-44 (explaining Schumacher's concerns about arbitration not being timely requested); Docket Item 25 at 15.

Schumacher cites the Ninth Circuit's decision in *Banks v. Bethlehem Steel Corp.*, 870 F.2d 1438 (9th Cir. 1989), for the proposition that "where the underlying claim concerns the failure to perform a procedural or ministerial act" that "would undermine the judgment needed to assess the merits of a union member's claims"—such as "timely proceeding through the steps of the CBA grievance process"—"the union's conduct is deemed arbitrary." Docket Item 25 at 14 (citing *Banks*, 870 F.2d at 1442-43). In *Banks*, the Ninth Circuit reviewed its prior caselaw "finding a breach of the duty of fair representation based upon a union's arbitrary conduct" and noted that "[i]n all cases in which [the circuit had] found a breach of the duty of fair representation based on a union's arbitrary conduct, it [wa]s clear that the union failed to perform a procedural or ministerial act, that the act in question did not require the exercise of judgment[,] and that there was no rational and proper basis for the union's conduct." 870 F.2d at 1442 (citation omitted). Under such circumstances, the court found, the failure to perform a ministerial task "placed the union in a situation where it either could not or would not make an informed judgment regarding the merits of individual claims." *Id.* at 1443.

As best as this Court can tell, the Second Circuit has not articulated that principle. But in *Caputo*, Judge I. Leo Glasser of the Eastern District of New York looked to Ninth Circuit precedent and agreed that "[t]he failure to perform a ministerial task where the individual interest is strong and where the result virtually extinguishes the claim is the sort of omission that is properly subject to judicial recourse because it

does not interfere with the union's discretion."  730 F. Supp. at 1228-29; *see also*

*Spears v. Int'l Bhd. of Teamsters Local 202*, 2013 WL 6687261, at *2 (E.D.N.Y. Dec. 18,

2013) (when employee had been terminated after finding of child abuse, union's "failure

to [timely] proceed to arbitration knowing that the finding of child abuse had been

overturned" meant employee plausibly pleaded claim for breach of duty of fair

representation).  And according to Schumacher, because the union did not timely

proceed to arbitration after VNA upheld his termination, they failed to perform just that

kind of ministerial task when his individual interest—challenging his termination—was at

its strongest.

CWA argues that this case is different because "the decision whether to pursue

arbitration is a 'reasoned decision' and not a 'ministerial act.'"  *See* Docket Item 26 at 9.

In both *Caputo* and *Spears*, the grievance in question was rejected as untimely at some

point during the grievance process, making it clear that the union had failed to take a

ministerial action.  *See Spears*, 2013 WL 6687261, at *1-2 (employer concluded that

grievance was not timely filed under the CBA and refused to reinstate employee);

*Caputo*, 730 F. Supp. at 1224 (noting that management representative had rejected

grievance as untimely).  In contrast to those cases, CWA says it protected

Schumacher's grievance for possible arbitration under the CBA.  *See* Docket Item 13-7

at 3 (Trainor's June 2022 letter stating that "[t]he grievance was protected for possible

arbitration on January 12, 2022").

But even after this Court gave CWA the opportunity to submit additional

materials, *see* Docket Item 18, CWA still has not provided any proof that it protected

Schumacher's grievance for arbitration.  Stated another way, while Schumacher was

told that CWA had "protected" his grievance, Docket Item 13-7 at 3, CWA has offered

no evidence in support of that assertion.  Schumacher, in contrast, says that CWA

missed the deadline for arbitration, denied his appeals to cover up its mistake, and

therefore acted arbitrarily and in bad faith.  *See* Docket Item 25 at 14, 17 (arguing that

the "failure to perform a procedural or ministerial act . . . like timely proceeding through

the steps of the CBA grievance process . . . would undermine the judgment needed to

assess the merits of a union member's claims . . . is deemed arbitrary" and also

accusing CWA of not proceeding to arbitration to "cover" for its "blunder").  That raises

an issue of fact precluding summary judgment.

CWA argues that any timing-related concerns are immaterial because its

decision not to pursue Schumacher's grievance to arbitration was a "reasoned decision"

and not something it failed to do to hide procedural negligence.  *See* Docket Item 26 at

8-10.  And CWA points to the GPS data and previous grievance arbitrations that CWA

had lost based on violations of the same Kaleida policy to support its argument.  *See id.*

at 9.  But that misses the point.  As noted in *Banks*, the failure to arbitrate—ordinarily a

reasoned decision—can be arbitrary when a "fundamental flaw" colors the union's

analysis of the individual claim.  *See Banks*, 870 F.2d at 1443.  In other words, if CWA

decided not to arbitrate Schumacher's grievance after it missed the deadline to request

arbitration, CWA's analysis could not have been "reasoned" because it was made

against the backdrop of its fundamental procedural error—an error that CWA would

have had good reason to hide.

And Schumacher has plausibly alleged just that.  Indeed, even though

Schumacher as an individual employee could not take his claim to arbitration without

CWA's support, *see* Docket Item 13-7 at 3, he was not informed of VNA's decision until LeBlanc's letter dated March 10, 2022, Docket Item 13-4, well outside the 30-day period in which CWA could pursue arbitration, *see* Docket Item 13-11 at 29.[15]  Even worse, Schumacher says, he did not get to see his grievance file until after he learned of the decision not to arbitrate his grievance.  *See* Docket Item 25-4 at ¶ 40 ("I was not allowed to see my grievance file at CWA Local 1122's office until March 28, 2022.").  Without conclusive evidence from CWA that it indeed preserved the right to arbitrate and decided not to pursue arbitration before the deadline expired, questions of fact preclude summary judgment on the breach of the duty of fair representation.

At this stage of the case, this Court cannot and does not pass judgment on the merits of the reasoning CWA provided Schumacher for not pursuing his grievance to arbitration: that Schumacher admitted sometimes taking short cuts and that CWA lost similar grievance arbitrations under the same policy.  Even if those explanations are reasonable, however, CWA's allegedly late notification of its decision might suggest that they were not the real reason CWA did not pursue arbitration.

In sum, CWA has not produced undisputed evidence that Schumacher's grievance was "protected," and that arbitration was possible, if his internal appeals were successful.  Therefore, viewing the facts in the light most favorable to Schumacher—as the Court must at this stage—CWA has not proven that its decision not to arbitrate was "reasoned" and not an arbitrary or bad faith choice designed to cover up its missed

---

[15] The Court notes that the CBA measures the time to appeal with "working days," a term that is not defined within the CBA.  *See generally* Docket Item 13-11.  But even assuming that working days mean business days, well over 30 days elapsed between January 4, 2022, when Schumacher alleges the final decision was made by VNA, and March 10, 2022, the date of LeBlanc's letter.

deadline. *Cf. Caputo*, 730 F. Supp. at 1229 (concluding that union's "failure to act does make out a claim for the breach of the duty of fair representation because it is not the result of a deliberative process, but rather an omission which is properly characterized as arbitrary"). Because that issue is central to the analysis of the duty of fair representation, and because its answer is so uncertain at this point, summary judgment on Schumacher's breach of fair representation claim is denied.[16]

### D.    Breach of the CBA

Schumacher says that VNA "breached the terms of the . . . CBA by terminating [him] on false pretenses" and without providing him the "progressive discipline" that he deserved. Docket Item 1 at ¶¶ 61-62. At its core, Schumacher's claim is that VNA terminated him based on inaccurate data and that, even if he had in fact falsified

---

[16] As noted earlier, to establish a breach of the duty of fair representation, a plaintiff must also show that "there is a causal connection between the [u]nion's wrongful conduct and any injuries that [the plaintiff] suffered." *See Smith v. Continental AFA*, 562 F. Supp. 2d 283, 290 (D. Conn. 2008) (citing *Spellacy*, 156 F.3d at 126). Here, the ultimate injury that Schumacher says he suffered is his termination by VNA and the resulting loss of income. *See, e.g.*, Docket Item 1 at ¶ 56 (alleging that "Schumacher has suffered damages, including lost compensation and benefits, as a result of CWA's breach of its duty to represent" him). Viewing the facts in the light most favorable to Schumacher, if in fact CWA did not arbitrate Schumacher's grievance for the arbitrary or bad faith reasons discussed earlier, a jury could reasonably conclude that there was a causal link between CWA's conduct and Schumacher's injuries. In other words, because arbitration was the only avenue for Schumacher to challenge his termination following the end of the three CBA-mandated meetings with VNA, there would clearly be a causal link between any wrongful conduct by CWA that precluded arbitration and the injuries Schumacher alleges he suffered due to his termination. *See Smith*, 562 F. Supp. 2d at 294 (denying summary judgment where "reasonable jury could conclude that [u]nion acted arbitrarily when it declined to pursue [plaintiff]'s grievance" and plaintiff alleged a resulting emotional injury and having to work less desirable shift).

records, he was a long-time employee who should have been given progressive discipline before his employment was terminated.

Under the CBA, "[i]t is expressly recognized" that VNA has the right "to discharge or otherwise discipline employees for just cause," Docket Item 13-11 at 7, and that the CBA's grievance process begins when such action is taken, *id.* at 25. The issue of whether Schumacher's termination breached the CBA, then, depends on whether he was terminated with "just cause." But that question is complicated by the fact that the CBA never defines "just cause." *See generally* Docket Item 13-11.

"When courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). Contractual ambiguity "is a question of law for the court" and "is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Trs. of the Sheet Metal Workers' Nat'l Pension Fund v. Steel & Duct Fabrication, Inc.*, 124 F. Supp. 3d 187, 196 (E.D.N.Y. 2015) (first quoting *Pig Newton, Inc. v. Bds. of Dirs. of Motion Picture Inds. Pension Plan*, 95 F. Supp. 3d 366, 375 (S.D.N.Y. 2015), then quoting *Lynch v. Inter-Cnty. Bldg. Materials Corp.*, 2013 WL 5652524, at *8 (E.D.N.Y. Oct. 15, 2013)).

That ambiguity is precisely what precludes summary judgment for VNA here. On the one hand, portions of the CBA seem to contemplate the progressive discipline to

which Schumacher says he was entitled; indeed, the provisions addressing how long verbal warnings, written reprimands, and suspensions remain in an employee's personnel file seem to suggest just that. *See* Docket Item 13-11 at 27. Given those provisions, it would be reasonable to think that termination for "just cause" means termination after exhausting other forms of progressive discipline. What is more, Schumacher's own notice of termination—a document titled "Corrective Action Form"— states that "[c]ontinued noncompliance will result in further corrective action up to and including termination," *see* Docket Item 13-2 at 2, suggesting that the very form VNA used to terminate Schumacher's employment contemplated progressive discipline.

On the other hand, it also is reasonable to think that the CBA's "express[]" recognition of VNA's right to "establish personnel rules[] and to discharge or otherwise discipline employees for just cause," Docket Item 13-11 at 7, means that VNA can discipline employees on a case-by-case basis as it sees fit. And it also would be reasonable to think that an employer such as VNA—which provides home health care services—could terminate an employee for falsifying data without first having to resort to less severe sanctions. For that matter, it seems reasonable that some workplace misbehavior could be so serious—committing a crime while on the job, for example— that immediate termination would be warranted.

While it is true that a court may look to extrinsic evidence in the face of an ambiguous contract, "summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d

63, 68 (2d Cir. 2008).  Here, CWA's and VNA's assertions that CWA had lost prior grievances related to the violations of the same policy for which VNA terminated Schumacher are not enough, without more, to resolve the meaning of "just cause." Details of those past grievances have not been provided to the Court, so this Court has no idea about such things as whether those prior employees were afforded progressive discipline, the extent of the internal investigations prior to termination, or even whether the other terminated employees were probationary or long tenured like Schumacher.

Put simply, this Court cannot determine, based on the record before it, what "just cause" means under the CBA and whether it includes some sort of progressive discipline for long-time employees prior to termination.  And "[w]here factfinders could differ as to the conduct which constitutes 'just cause' as contained in a [CBA], that determination cannot be resolved on a summary judgment motion."  *Amaty v. Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO*, 2020 WL 3105529, at *8 (D. Conn. Feb. 25, 2020) (quoting *Cook v. Nat'l Mar. Union of Am.*, 1984 WL 1306, at *3 (S.D.N.Y. Dec. 4, 1984)).

Moreover, Schumacher vehemently disputes the findings upon which VNA relied to terminate his employment.  For example, Schumacher disputes the accuracy of VNA's GPS and EMR data, *see, e.g.*, Docket Item 25-1 at 3-4, ¶¶ 17-18, and he identifies what he says are errors in it, *id.* at 6, ¶¶ 7, 9.  Especially when coupled with the CBA's ambiguity just discussed, those questions of fact preclude summary judgment as well.

In sum, because there are questions of fact underlying Schumacher's termination and because reasonable factfinders could differ as to what "just cause" means under the CBA, summary judgment on Schumacher's claim against VNA is denied.

## II.   SCHUMACHER'S NEGLIGENCE CLAIM

Schumacher also raises a negligence claim[17] against CWA, alleging that "CWA erroneously and negligently may have let Schumacher's [g]rievance . . . lapse, by failing timely to demand or to proceed with arbitration of Schumacher's grievance." *See* Docket Item 1 at ¶¶ 58-59.

Section 301 preempts state law claims "arising out of allegations of breach of contract or of liability in tort" if they "require the court to interpret the terms or legal consequences of a breach of the" CBA. *Duran v. Jamaica Hosp.*, 216 F. Supp. 2d 63, 69 (E.D.N.Y. 2002). On the other hand, such claims are not preempted "if they exist independently of a [CBA] and can be resolved without its interpretation." *Lever v. Entergy Nuclear Oper. Inc.*, 2016 WL 1627619, at *2 (E.D.N.Y. Apr. 22, 2016) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409 (1988)).

Schumacher's negligence claim specifically alleges that CWA may not have timely demanded arbitration under the CBA and necessarily involves interpreting the CBA. *See* Docket Item 1 at ¶ 58. Therefore, "based on the undisputed facts on the record before this court, . . . [s]ection 301 preempts" Schumacher's negligence claim.

---

[17] "The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" *Sullivan v. Gelb*, 735 F. Supp. 3d 282, 301-02 (S.D.N.Y. 2024) (quoting *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015)). "If the defendant owes no duty to the plaintiff, the action must fail." *Pasternack*, 807 F.3d at 19.

*See Ycaza v. CT Transit-Stamford Div.*, 289 F. Supp. 2d 180, 182-83 (D. Conn. 2003)

(granting summary judgment on grounds including preemption by section 301); *see also*

*Salamea v. Macy's East, Inc.*, 426 F. Supp. 2d 149, 154 (S.D.N.Y. 2006) (negligence

claim preempted by LMRA where duty defendants owed to plaintiff "arose from" CBA).

CWA's motion for summary judgment on Schumacher's negligence claim therefore is

granted.

## <u>CONCLUSION</u>

For the foregoing reasons, VNA's converted motion for summary judgment,

Docket Item 12, is DENIED, and CWA's converted motion for summary judgment,

Docket Item 13, is DENIED IN PART and GRANTED IN PART.[18]  Schumacher's

negligence claim is dismissed, but his other claims may proceed.  CWA and VNA shall

answer the complaint consistent with the Federal Rules of Civil Procedure.


SO ORDERED.

Dated:   September 30, 2025
         Buffalo, New York



  */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

---

[18] This decision is without prejudice to the defendants' again moving for summary
judgment at the close of discovery.